E. Martin Estrada
United States Attorney
Mack E. Jenkins
Assistant United States Attorney
Chief, Criminal Division
THOMAS F. RYBARCZYK (Cal. Bar No. 316124)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-8452
     Facsimile:  (213) 894-0141
     E-mail:     thomas.rybarczyk@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division
FARA GOLD
Special Litigation Counsel
NIKHIL RAMNANEY (Cal. Bar No. 268554)
Trial Attorney
Criminal Section, Civil Rights Division


Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>                 v.<br><br>JOSE VIERA<br><br>            Defendant. | No. CR 22-211-ODW<br><br>UNITED STATES' SENTENCING POSITION<br><br>Hearing Date: March, 20 2022<br>Hearing Time: 11:00 a.m.<br>Location:     Courtroom of the<br>              Hon. Otis D. Wright,<br>              II |
|---|---|

    The United States of America, by and through the undersigned

prosecutors, files this sentencing position with respect to defendant

JOSE VIERA.

The United States sentencing position is based upon the attached memorandum of points and authorities and victim impact statement, the Presentence Investigation Report (Dkt. 30), the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 6, 2023                    Respectfully submitted,

                                        E. Martin Estrada
                                        United States Attorney

                                        Mack E. Jenkins
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                        THOMAS F. RYBARCZYK
                                        Assistant United States Attorney


                                        KRISTEN CLARKE
                                        Assistant Attorney General
                                        Civil Rights Division

                                        */s/ Fara Gold*
                                        _____
                                        FARA GOLD
                                        Special Litigation Counsel
                                        Civil Rights Division, Criminal
                                        Section


                                        NIKHIL RAMNANRY
                                        Trial Attorney
                                        Civil Rights Division, Criminal
                                        Section

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

I.     INTRODUCTION....................................................1

II.    PROCEDURAL HISTORY.................**Error! Bookmark not defined.**

III.   FACTUAL BACKGROUND.............................................2

A.     The Defendant's Sexual Abuse of the Victim....................2

B.     The Defendant's Uncharged Sexual Assaults.....................3

C.     The Victim's Official Report to Federal Authorities...........4

IV.    THE UNITED STATES SENTENCING GUIDELINES CALCULATION...........5

V.     A SENTENCE OF 120 MONTHS' IMPRISONMENT SERVES THE PURPOSE
       OF THE 3553 FACTORS...........................................7

A.     A 120-Month Sentence Captures The Nature and Circumstances
       of the Offense................................................8

B.     A Sentence of 120 Months Promotes Respect for the Law........10

C.     A 120-Month Sentence Will Deter Future Misconduct............11

D.     A 120-Month Sentence Will Not Lead to Unwarranted
       Sentencing Disparities.......................................13

VI.    CONCLUSION...................................................16

**TABLE OF AUTHORITIES**

<u>CASES</u>

Edwards v. United States,
   523 U.S. 511 (1998) ......................................... 10

Flores v. County of Los Angeles,
   758 F.3d 1154, 1160 (9th Cir. 2014) ......................... 11

Gall v. United States,
   552 U.S. 38 (2007) .......................................... 5

Nichols v. United States,
   511 U.S. 738 (1994) ......................................... 9

United States v. Booker,
   543 U.S. 220 (2005) ......................................... 5

United States v. Carty,
   520 F.3d 984 ................................................ 7

United States v. Davis,
   855 F. App'x 362 (9th Cir. 2021) ........................... 15

United States v. Etsitty,
   1:11-CR-3191 (D.N.M. 2012) ................................. 15

United States v. Fitch,
   659 F.3d 788 (9th Cir. 2011) ............................... 10

United States v. Garcia,
   2:14-CR-01251 (D.N.M. 2014) ................................ 15

United States v. Gragg,
   6:17-CR-00061 (E.D. Okla. 2017) ............................ 15

United States v. Herbert,
   813 F.3d 551 (5th Cir. 2015) ............................... 10

United States v. Hill,
   915 F.2d 502 (9th Cir. 1990) ............................... 12

United States v. Kindley,
   2022 WL 17245115 (8th Cir. Nov. 28, 2022) .................. 15

United States v. Logan,
   1:19-CR-00125 (E.D. Tenn. 2020) ............................ 16

United States v. McQueen,
   727 F.3d 1144 (11th Cir. 2013) ............................. 13

United States v. Mustafa,
   695 F.3d 860 (8th Cir. 2012) ............................... 10

*United States v. Perez*,
   5:13-CR-00087 (C.D. Cal. 2014) ................................ 15

*United States v. Powers*,
   4:19-CR-00151 (N.D. Okla. 2019) ............................... 15

*United States v. Shaw*,
   891 F.3d 441 (3d Cir. 2018) .................................. 14

*United States v. Thames*,
   214 F.3d 608 (5th Cir. 2000) ................................. 11

*United States v. Watts*,
   519 U.S. 148 (1997) ........................................... 9


**STATUTES**

18 U.S.C. § 242.................................................2

18 U.S.C. § 250................................................14

18 U.S.C. § 3553........................................1, 7, 8, 14

34 U.S.C. § 20911..............................................1


**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. § 2A3.1 .............................................. 6

U.S.S.G. § 2D1.1 .............................................. 6

U.S.S.G. § 2H1.1 .............................................. 6

U.S.S.G. § 3A1.1 .............................................. 6

U.S.S.G. § 3E1.1 .............................................. 6

U.S.S.G. § 5G1.1 .............................................. 6

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3       Defendant JOSE VIERA ("defendant"), while serving in his

4  capacity as a federal corrections officer for the Bureau of Prisons

5  ("BOP") at the Metropolitan Detention Center—Los Angeles ("MDC-LA")

6  sexually assaulted J.P., an incarcerated woman to whom he owed a

7  constitutional duty not to subject to abuse. But instead of upholding

8  his constitutional oath, the defendant did just the opposite. He

9  penetrated her anus with his penis without her consent, while she was

10  isolated and alone in a cell, sick with symptoms of COVID-19.

11       As a result, on May 24, 2022, the defendant pleaded guilty

12  pursuant to a plea agreement (Dkt. 6) to a single-count Bill of

13  Information charging him with Deprivation of Rights under Color of

14  Law resulting in bodily injury, in violation of 18  U.S.C. § 242.

15       The United States has no objections to the United States

16  Probation Office ("USPO") Presentence Report ("PSR"). (Dkt. 30). For

17  the reasons set forth below, the United States concurs in the

18  recommendation of USPO and respectfully requests that the defendant

19  be sentenced to 120 months in prison followed by three years of

20  supervised release, and that he be ordered to pay restitution to the

21  victim and a mandatory $100 special assessment.(Dkt 29.)[1] A 120-month

22

23       [1] The USPO recommends that the defendant register and maintain
sex offender registration upon his release from custody. However, it
24  is the United States' position that a conviction of 18 U.S.C. § 242,
by itself, does not qualify as a sex offense under SORNA. *See* 34
25  U.S.C. § 20911(5)(A); *United States v. Icker*, 13 F.4th 321, 327-29
(3d Cir. 2021)(former police officer convicted of deprivation of
26  rights under color of law could not be subjected to registration
requirements under SORNA, since he was not convicted of an enumerated
27  sex offense, notwithstanding that his conduct involved sexual assault
of women he encountered during the course of his duties).

28

*(footnote cont'd on next page)*

1  sentence is sufficient, but not greater than necessary, to serve the

2  purposes of sentencing, pursuant to 18 U.S.C. § 3553(a). It is

3  consistent with the recommended sentence under the United States

4  Sentencing Guidelines, reflects the seriousness of the defendant's

5  offense, endeavors to promote respect for the law by serving as a

6  deterrent to similar misconduct by BOP employees, and provides a just

7  punishment for a federal corrections officer who, instead of ensuring

8  that the victim remained safe in COVID-19 isolation, subjected her to

9  cruel and unusual punishment by anally raping her.

10 **II.   FACTUAL BACKGROUND**

11        **A.    The Defendant's Sexual Abuse of the Victim**

12        The defendant was a BOP corrections officer, assigned to MDC-LA.

13 As a corrections officer, he had a sworn duty to uphold the

14 Constitution, and in so doing, ensure the safety and security of

15 those housed at MDC-LA. He also knew that any form of sexual conduct

16 with inmates in his care was against the law and against BOP policy.

17        Nonetheless, during the morning of December 20, 2020, while

18 acting in his capacity as a corrections officer, the defendant

19 entered J.P.'s cell. At the time, J.P. was isolated in that cell

20 because she had recently tested positive for COVID-19 and was

21 symptomatic, experiencing a high fever, headache, body-aches, severe

22 sore throat, and difficulty breathing.[2] She initially thought that

23 the defendant entered her cell to bring her breakfast, as he was

24 tasked to do. She was wrong.

25        Instead, the defendant laid down next to J.P. in her bed,

26 sandwiching her between his body and the wall. In doing so, the

27

28

        [2] See J.P.'s victim impact statement (Exhibit 1).

defendant positioned himself with the front of his body pressing against her back. He then touched J.P.'s breasts and pulled her shorts and underwear down. He then penetrated her vagina with his fingers, all without her consent. J.P. could feel the defendant's penis briefly penetrate her vagina, and she tried to wiggle away.[3] Her efforts were for naught because the defendant then penetrated her anus with his penis until he ejaculated, even though she told him that she did not want him to do so. As the defendant was sexually assaulting her, J.P. feared that he would physically harm her, and in fact, the defendant's conduct resulted in bodily injury to her in the form of anal soreness and bleeding.

### B.    The Defendant's Uncharged Sexual Assaults

In addition to uncharged digital penetration noted above, the defendant sexually assaulted J.P. again the following day on December 21, 2020. That morning, he entered her cell, and again, he attempted to get into her bed. J.P. managed to stop the defendant by telling him that her anus was still hurting from the day before. In response, the defendant commented that he had not wanted to get her pregnant—an attempted justification for his non-consensual anal penetration.

Although the defendant did not engage in any sexual misconduct that morning, he returned that afternoon, unzipped his pants and demanded J.P. put her mouth on his penis, telling her to "suck it." J.P. reluctantly began performing oral sex on the defendant, submitting out of fear. She was ultimately able to stop the defendant

---

[3] The defendant's touching of the victim's breasts and penetration of her vagina are uncharged conduct. As part of the plea agreement, the defendant admitted to penetrating the victim's anus with his penis.

3

by telling him that she heard someone coming, essentially alerting him that he was about to be caught.

Shortly thereafter, another inmate who tested positive for COVID-19 moved into J.P.'s cell. Thus, the defendant no longer had access to sexually assault J.P. without detection. However, J.P.'s cellmate also reported sexual misconduct perpetrated by the defendant. She told federal agents that the defendant grabbed her buttocks on one occasion when she was facing away from him. He further made inappropriate sexual comments to her about "tossing the salad," a euphemism for performing oral sex on someone's anus in prison. J.P.'s cellmate explained that she did not report the defendant's conduct when it occurred because inmates do not ordinarily report corrections officers for their misconduct.

**C.    The Victim's Official Report to Federal Authorities**

J.P. herself did not immediately report the defendant's misconduct to authorities. Instead, she waited three months until March 2021, when she was transferred to another facility and was no longer incarcerated in the same facility that the defendant worked, for fear of retaliation. It was then that she provided to federal authorities the torn portions of the sheets on which the defendant ejaculated after he raped her. Not uncommon for victims of BOP sexual abuse, she saved evidence that would corroborate her account, thinking that she would not otherwise be believed. As J.P. wrote in her victim impact statement (Exhibit 1):

> Had I not had that evidence, I wouldn't have wasted my time reporting anything because I would have known it would be his word against mine, and [the defendant] was a sworn-in correction officer at the time, and I was just a criminally convicted felon. They would have taken his word over mine, for sure.

4

Ultimately, DNA analysis of the semen on the sheet matched the defendant's DNA. Nonetheless, when federal agents from the Federal Bureau of Investigation (FBI) and U.S. Department of Justice Office of Inspector General (OIG) conducted a voluntary interview of the defendant, he falsely claimed that he never ejaculated while at MDC-LA — contrary to the fact that his semen was found on a sheet from inside a jail cell, in the possession of an incarcerated female. The defendant did, however, admit to looking at pornography and other sexually explicit material while inside MDC-LA, corroborated by digital evidence federal agents seized from his federal government-issued computer.

## III. THE UNITED STATES SENTENCING GUIDELINES CALCULATION

The Supreme Court has held that although the United States Sentencing Guidelines are advisory in nature, courts "must consult these Guidelines and take them into account when sentencing." United States v. Booker, 543 U.S. 220, 264 (2005). The Supreme Court has further emphasized that a district court must begin its sentencing proceedings by correctly calculating the applicable sentencing range, which serves as "the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007). As reflected in the plea agreement (Dkt. 6) and PSR (Dkt. 30), the Guidelines calculation is as follows:

| | | |
|---|---|---|
| Base Offense Level:(Deprivation of Rights cross references to Criminal Sexual Abuse) | 30 | [U.S.S.G. §§ 2H1.1, 2A3.1] |

5

| Specific Offense Characteristics: | | |
|---|---|---|
| Care, Custody, Supervisory Control | +2 | [U.S.S.G. § 2A3.1(b)(3)] |
| Color of Law | +6 | [U.S.S.G. § 2H1.1(b)] |
| Adjustments | | |
| Vulnerable Victim | +2 | [U.S.S.G. § 3A1.1(b)(1) |
| Acceptance of Responsibility | -3 | [U.S.S.G. § 3E1.1][4] |
| Total Offense Level: | 37 | |

The defendant falls in Criminal History Category I, as do virtually all BOP corrections officers who commit sexual assault; otherwise, they would likely not be employed in that capacity by the United States Department of Justice. The corresponding Sentencing Guidelines range, at an offense level of 37, corresponds to 210 to 262 months' imprisonment. However, because the statutory maximum penalty for the crime to which the defendant pleaded guilty is 120 months in prison (significantly less than the calculated guidelines range,) the recommended guidelines sentence is the statutory maximum penalty of 120 months in prison. *See* U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.").

---

[4] The United States hereby moves for a one-level decrease pursuant to U.S.S.G. § 3E1.1(b) and the plea agreement.

## IV.   A SENTENCE OF 120 MONTHS IMPRISONMENT IS REASONABLE AND APPROPRIATE AND SERVES THE PURPOSE OF THE 3553(a) FACTORS

Once the Court calculates the sentencing guidelines, it must then consider the factors set forth in 18 U.S.C. § 3553(a) when imposing a sentence. In consideration of those factors, a sentence of 120 months in prison is sufficient but not greater than necessary to comply with the purposes set forth under 18 U.S.C. § 3553(a)(2). United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (internal citations omitted) ("The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment."). That is, a sentence of 120 months provides an overall just punishment because it reflects the seriousness of the offense by accounting for the vile nature of the defendant's conduct. And, it will promote respect for the law by holding the defendant accountable for violating his Constitutional oath and trampling the rule of law in such a heinous manner. See 18 U.S.C. § 3553(a)(2)(A). Such a sentence also aims to deter future misconduct within the federal corrections setting and to protect the public from the defendant's future crimes so long as he is incarcerated. See 18 U.S.C. §§ 3553(a)(2)(B),(C). Finally, a 120-month sentence will not create unwarranted sentencing disparities among defendants who have been convicted of similar conduct. See 18 U.S.C. § 3553(a)(6).

1       **1.    A 120-Month Sentence Captures the Nature and**
2       **Circumstances of the Offense**

3           When a corrections officer sexually abuses an individual in his
4   custody, the gravity of his conduct cannot be overstated,
5   particularly because of the coercive nature of the relationship
6   between the offender and the victim. But in this case, there was more
7   than a disparate power dynamic between the perpetrator and victim.
8   Here, J.P. was alone, isolated, and sick with COVID-19 at the height
9   of a global pandemic when other inmates were dying and vaccines were
10  not yet available — and she actively did not consent, letting the
11  defendant know it. These facts make the nature and circumstances of
12  the offense particularly egregious and further underscore that there
13  is no way the defendant could have thought J.P. was a willing
14  participant.

15          As part of his guilty plea, the defendant admitted that he raped
16  the J.P, fully knowing that she did not want him to penetrate her
17  anus with his penis. Nonetheless, he did so anyway, putting her in
18  fear of physical harm and in fact injuring her. Then he came back for
19  more the next day. The defendant ultimately tried to cover up his
20  criminal conduct by lying to federal agents because he knew what he
21  did was wrong and against the law, against BOP policy, and in
22  violation of his constitutional oath.

23          There are no words to aptly convey the depravity of the
24  defendant's conduct and the severe trauma that the defendant caused
25  J.P. Nor is there an adequate sentence that will truly restore J.P.'s
26  sense of safety, dignity, and bodily autonomy which the defendant
27  took when he climbed into her sick bed and anally raped her.
28  Nonetheless, in structuring the pre-indictment plea agreement that

calls for both a recommended and a statutory maximum penalty of 120 months in prison, the United States sought to both capture the severity of the offense and vindicate J.P.'s constitutional rights, while sparing her the uncertainty of trial and the trauma endemic to testifying about the degrading and intimate nature of sexual assault.

With this plea agreement, the United States further endeavored to recognize that the defendant, despite initially lying to federal agents, took responsibility prior to a grand jury indicting him on all possible charges. A 120-month sentence is significantly less than the sentence he would face if convicted after trial of all potential charges. But given his acknowledgement of guilt, a sentence of 120 months in prison will hold the defendant sufficiently responsible for sexually assaulting J.P, isolated with COVID-19, and wholly dependent on him for her safety and well-being.

Such a sentence also reflects that the defendant did not commit just one act of anal penetration, though that alone warrants 120 months in prison. Rather it captures the scope of his misconduct that only ceased because another inmate moved into the J.P.'s cell, denying him the opportunity to continue to exploit her isolation. To that point, the Supreme Court has repeatedly held that a trial court can and should consider uncharged relevant conduct when imposing a sentence in order to fully understand the scope of the defendant's conduct. United States v. Watts, 519 U.S. 148, 151-52, (1997) (internal citations omitted) ("Highly relevant-if not essential [to the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."). This includes a defendant's past criminal conduct, even if such conduct did not result in a conviction.

1   Nichols v. United States, 511 U.S. 738, 747 (1994); United States v.

2   Fitch, 659 F.3d 788, 795 (9th Cir. 2011)(district court can increase

3   the defendant's sentence based on uncharged conduct); United States

4   v. Mustafa, 695 F.3d 860, 862 (8th Cir. 2012) (district court may

5   rely upon uncharged relevant conduct to enhance a sentence imposed

6   within statutory limits).

7        Therefore, to impose a sentence that fully captures the gravity

8   and scope of the defendant's misconduct, this Court should consider

9   that the defendant not only anally penetrated the victim, but also

10  that he groped her breasts and penetrated her vagina, and then

11  coerced her into performing oral sex the next day. Indeed, the

12  defendant's uncharged conduct is, at the very least, all the more

13  reason not to vary from a sentence of 120 months.

14          **2.   A Sentence of 120 Months Promotes Respect for the Law**

15       It is especially troublesome and contributes to the erosion of

16  the rule of law when federal law enforcement officers — sworn to

17  uphold the Constitution — flout the law and their oath as the

18  defendant did, first when he raped J.P. and then when he subsequently

19  lied about it. Courts have held that where law enforcement officers,

20  as corrections officers are, abuse their positions of authority, such

21  offenses should be treated more seriously than crimes committed by

22  private citizens. See United States v. Hebert, 813 F.3d 551, 563 (5th

23  Cir. 2015) (affirming an upward variance in the sentencing of a

24  defendant-officer based on the district court's finding that the

25  defendant abused his position of trust when committing the offense);

26  United States v. Thames, 214 F.3d 608, 614 (5th Cir. 2000) ("A

27  defendant's status as a law enforcement officer is often times more

28  akin to an aggravating as opposed to a mitigating sentencing factor,

as criminal conduct by [an officer] constitutes an abuse of a public position."). Because of the defendant's exploitation of authority and his nonchalant lies about it, and to promote respect for the rule of law and the Constitution, the defendant should receive the recommended sentence of 120 months in prison.

### 3. A 120-Month Sentence Will Deter Future Misconduct

The defendant exploited his position not only as a corrections officer who controlled the lives of the inmates in his custody, but also as an officer assigned to maintain the health and safety of those in isolation as a result of the COVID-19 global pandemic. He used the victim's illness and isolation as a catalyst for his depravity, believing his behavior would go undetected. Similarly, he lied to federal agents because he believed he could abuse the victim with impunity and get away with it. Just like every BOP employee, he knew that he was not permitted to engage in any sexual conduct with inmates, but that did not deter him. If neither the moral wrong nor the threat of prison was enough to deter him, then the United States hopes that getting caught, convicted, and sentenced to 120 months in prison will deter him from committing sexual assault upon his release. Flores v. County of Los Angeles, 758 F.3d 1154, 1160 (9th Cir. 2014) ("If the threat of prison time does not sufficiently deter sexual assault, it is not plausible to assume that a specific instruction not to commit sexual assault will provide such deterrence.") If nothing else, a sentence of 120 months in prison can ensure specific deterrence and the safety of the community for the eighty-five percent of the 120 months that the defendant remains imprisoned.

1    Such a sentence also aims to deter other federal corrections

2    officers more generally. Deterrence is particularly important where

3    law enforcement officers abuse their authority, as they occupy

4    positions that "'provid[e] the freedom to commit a difficult-to-

5    detect wrong." United States v. Hill, 915 F.2d 502, 506 (9th Cir.

6    1990), overruled on other grounds by United States v. Contreras, 593

7    F.3d 1135 (9th Cir. 2010). There are few crimes more difficult to

8    detect than sexual assault where there are rarely independent

9    witnesses and the case is often reliant on the credibility of the

10   victim. This difficulty is compounded in the prison context, where a

11   victim's credibility is under unfair attack from the outset by virtue

12   of her status as a convicted person. Those who abuse their power know

13   and rely on this reality. Those who are victimized likewise know they

14   are not likely to be believed over a law enforcement officer,

15   particularly when there is no other evidence to corroborate their

16   account. This case is no different. That is why the victim saved

17   pieces of the semen-stained sheet and why she waited to report the

18   defendant until she was no longer at MDC-LA. A 120-month sentence

19   will demonstrate that offending officers cannot rely on the power of

20   their position or their victim's vulnerabilities to skirt

21   accountability. While these crimes may be difficult-to-detect, would-

22   be defendants need to understand that a victim's account is indeed

23   evidence, it will be taken seriously, it will result an

24   investigation, and where appropriate, accountability and punishment

25   will follow. The United States' recommended sentence of 120 months in

26   prison should signal the necessity of taking such allegations

27   seriously, even when those allegations are premised on the word of a

28   victim.

General deterrence of sexual assault is an ideal. There is no way to measure whether the sentence imposed will actually deter other corrections officers from engaging in similar conduct. But given the defendant's disrespect for the rule of law, the humiliation and emotional trauma suffered by the victim, and the deep mistrust that misconduct by law enforcement breeds, general deterrence is a worthy consideration for a substantial sentence. See United States v. McQueen, 727 F.3d 1144, 1158 (11th Cir. 2013) (observing that the need for general deterrence is especially compelling in the context of prison officials abusing prisoners). The defendant failed to adhere to his constitutional obligation in one of the most violative ways possible. It is in the interest of other inmates and corrections officers within the BOP to know that when a corrections officer violates that oath and the law, there will be serious consequences.

### 4.   A 120-Month Sentence Will Not Lead to Unwarranted Sentencing Disparities

No two cases are alike. Nor is the impact of sexual assault the same for any two victims. The United States therefore considers each case individually when making a sentencing recommendation, though similarly situated cases help inform such a recommendation. Likewise, 18 U.S.C. § 3553(a)(6) states that when imposing a sentence, the Court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Here, however, law enforcement officers who have been convicted of violating 18 U.S.C. § 242 throughout the United States have been sentenced to a range of prison terms, depending on a variety of factors, including the applicably of statutory enhancements, whether they pleaded guilty or were convicted

13

at trial, and the number of people they victimized. As the cases below set out, no one sentence will create a sentencing disparity and certainly not an unwarranted one. Moreover, a sentence of 120 months, although the statutory maximum for the crime to which defendant pleaded guilty, is still 90 months below the recommended guidelines range for this conduct. Additionally, due to the enactment of 18 U.S.C. § 250 (Penalties for Civil Rights Offenses Involving Sexual Misconduct) as part of the 2022 Reauthorization of the Violence Against Women Act, if the defendant committed this crime on or after October 1, 2022, such conduct would be punishable up to life in prison rather than up to 10 years in prison. See 18 U.S.C. § 250(b)(1). These new penalties illustrate Congress's recognition of the gravity of this conduct and that such conduct be punished accordingly.

A sentence of 120 months will therefore not create an unwarranted disparity but rather will fall within the heartland of cases involving similar misconduct. See, e.g., United States v. Shaw, 891 F.3d 441, 446 (3d Cir. 2018)(corrections officer sentenced to 25 years in prison for violating 18 U.S.C. § 242 by engaging in nonconsensual vaginal penetration); United States v. Kindley, 2022 WL 17245115 (8th Cir. Nov. 28, 2022)(private prisoner transport officer sentenced to life in prison for sexually assaulting two women in violation of 18 U.S.C. § 242); United States v. Davis, 855 Fed. App'x 362, 363 (9th Cir. 2021) (tribal officer sentenced to 51 months in prison for violating 18 U.S.C. § 242 and related statutes when he put his mouth on arrestee's breasts and deleted a photograph of her bare breasts); United States v. Gragg, 6:17-CR-00061 (E.D. Okla. 2017)(road patrol officer sentenced to 108 months in prison pursuant

to a pre-indictment guilty plea for forcing an arrestee to put her mouth on his penis in violation of 18 U.S.C. § 242); United States v. Perez, 5:13-CR-00087 (C.D. Cal. 2014) (officer sentenced to 300 months in prison for sexually assaulting two women during the course of his duties in violation of 18 U.S.C. § 242); United States v. Garcia, 2:14-CR-01251 (D.N.M. 2014)(officer sentenced to 108 months in prison pursuant to a pre-indictment guilty plea officer for digitally penetrating vagina of a student during a ride along in violation of 18 U.S.C. § 242); United States v. Etsitty, 1:11-CR-3191 (D.N.M. 2012) (tribal officer sentenced to 54 months in prison for violating 18 U.S.C. § 242 for driving an arrestee to a secluded area, groping her breast, and then lying to the FBI about his conduct.).

United States v. Logan, 1:19-CR-00125 (E.D. Tenn. 2020), is particularly instructive because it also involved a pre-indictment guilty plea where the recommended guidelines sentence was the statutory maximum penalty. In that case, the defendant, a patrol officer for the Chattanooga Police Department, entered a pre-indictment guilty plea to a Bill of Information charging two counts of violating 18 U.S.C. § 242, resulting in bodily injury, the same charge to which the defendant pleaded guilty in this case. There, the officer pleaded guilty to assaulting two women he encountered during the course of his duties. Because the guilty plea involved two counts, his maximum statutory penalty was 20 years' imprisonment. The recommended guidelines sentence was the statutory maximum because the guidelines calculations would have otherwise recommended a life sentence. The court sentenced the defendant to 20 years in prison in accordance with the guidelines recommendation.

There, like here, the defendant received the benefit of taking responsibility early and avoiding additional charges with higher exposure. Just as in that case, here, the United States is asking the Court to sentence the defendant commensurate with his crime and provide him no more of a benefit than he has already received under the terms of his plea agreement. In doing so, this Court would be imposing a sentence that is sufficient but not greater than necessary to comply with the Section 3553(a) factors.

**V.    CONCLUSION**

For the foregoing reasons, the United States respectfully requests the Court impose a sentence of 120 months' imprisonment, followed by three years of supervised release, along with an order that the defendant pay restitution to the victim along with the mandatory special assessment of $100. Such a sentence meets the 3553(a) sentencing objectives by promoting respect for the law, reflecting the seriousness of the offense, and holding the defendant accountable for his exploitive and egregious conduct.